799 So.2d 177 (2001)
HealthSOUTH REHABILITATION CORPORATION
v.
FALCON MANAGEMENT COMPANY.
1990995.
Supreme Court of Alabama.
April 20, 2001.
*179 Jonathan H. Waller and Charles A. McCallum III of Campbell, Waller & McCallum, L.L.C., Birmingham; John A. Owens of Owens & Almond, L.L.P., Tuscaloosa; Frank Corley Ellis, Jr., of Wallace, Ellis, Fowler & Head, Columbiana, for appellant.
Wilbor J. Hust, Jr., of Zeanah, Hust, Summerford, Davis & Williamson, Tuscaloosa, for appellee.
PER CURIAM.
This case arises out of a lease dispute between HealthSouth Rehabilitation Corporation ("HealthSouth") and Falcon Management Company ("Falcon"). We affirm in part, reverse in part, and remand with instructions.

Facts and Procedural History
On May 27, 1994, Falcon subleased property in Tuscaloosa to HealthSouth.[1] The sublease provided that within 90 days of the signing of the sublease, HealthSouth, as sublessee, would furnish the plans and specifications for construction of a medical office building on the leased premises. The sublease required Falcon to begin construction of the building as soon as HealthSouth furnished the plans and specifications.
Because no building existed on the premises at the time the sublease was signed, the sublease provided for two kinds of rent: ground rent and improvements rent. Although the ground rent began when the lease term commenced on February 1, 1995, the improvements rent was not to commence until the construction of the medical office was completed to the extent that the building was ready for occupancy according to Tuscaloosa municipal ordinances. The sublease stated that the parties agreed that the size of the building was to be decided by HealthSouth, *180 and that the applicable improvements rent would depend upon the size of the building actually constructed. The sublease further provided that the estimated costs of the construction would be $82 per square foot. However, the sublease provided that in the event the actual costs were more or less than the estimated costs, then the beginning rent would be adjusted according to the actual costs and the costs would be reflected in an addendum to the original sublease. Although the lease contemplated that the actual costs might differ from the estimated costs of construction, it contained no provision excusing HealthSouth's performance under the lease if the actual costs escalated.
On the same date HealthSouth and Falcon entered into the sublease, Dr. Leslie Fowler entered into a "Clinic Service Agreement" ("the CSA") with MedPartners, a physician-management company. The CSA required MedPartners to sublease approximately 11,000 square feet of the proposed building from HealthSouth on behalf of Dr. Fowler and possibly other physicians who had similarly contracted with MedPartners. Although the CSA permitted Dr. Fowler to cancel it, he testified at trial that he was at all times willing to lease his portion of the proposed building.
After the sublease was signed, Health-South's in-house architect presented some schematic drawings for Falcon's review. Because the architect was already working on a different project, he was unable to complete any additional drawings. Thus, HealthSouth and Falcon mutually selected Gould Turner, an architectural firm from Nashville, to prepare the plans and specifications for the proposed building. Falcon contracted with Gould Turner and was the party responsible for paying the architects' fees in connection with the construction of the proposed building.
In May 1995, HealthSouth decided to construct a 24,000 square foot building. By August 1995, Gould Turner had presented final plans and specifications for a shell building. Although HealthSouth believed that these drawings were adequate for full construction of the building except for the tenant build-outs (the space to be subleased by MedPartners), Falcon insisted that the drawings were insufficient to construct the building because they lacked certain steel-shop drawings and bar-joist drawings. Additionally, HealthSouth never provided plans for the part of the building that it intended to occupy.
Once the plans and specifications were initially completed in August 1995, the estimated costs for the improvements had increased from $82 per square foot to $119 per square foot. Because of the increase in rent that would result from the higher costs, MedPartners was no longer willing to sublease space from HealthSouth in the proposed building.
At trial, Falcon asserted that, after receiving the new cost estimates, HealthSouth ceased working on the project. Conversely, HealthSouth presented testimony by one of the Gould Turner architects indicating that Falcon instructed Gould Turner that the project was not moving forward and to stop working until the architects were notified otherwise.
In December 1995, Falcon's lawyer wrote a letter to Darryl Brown, one of the project managers with HealthSouth, in which he inquired about the status of the plans and specifications for the building. Brown responded to Falcon in a December 15, 1995, letter, stating that HealthSouth's ability to move forward was dependent upon its having tenants willing to lease and occupy the additional space.
On August 26, 1996, Falcon's lawyer wrote Rick Byrd, HealthSouth's vice president *181 of real estate, notifying him that HealthSouth was in default for failing to provide the requisite plans and specifications for construction of the building. In that same letter, Falcon agreed to give HealthSouth an additional 90 days within which to complete the plans and specifications and present them to Falcon. The letter made no demand for "improvements rent."
On October 25, 1996, HealthSouth responded to the default letter, stating that it could not agree to lease any space from Falcon until HealthSouth had secured a sublease with MedPartners for the additional space in the building.[2] Because no plans had been furnished, Falcon wrote HealthSouth again on November 27, 1996, formally notifying HealthSouth of the default and giving HealthSouth 45 days within which to cure the default. Again, this letter made no demand for "improvements rent."
Representatives of HealthSouth and Falcon met in January 1997; at that meeting, HealthSouth stated that it would not go forward with the building without first securing a subtenant agreement. On January 24, 1997, Falcon wrote a letter to HealthSouth in which it declared HealthSouth to be in default and demanded over $7 million in accelerated improvements rent under the provisions in the sublease. From the time of default through the trial of this case, HealthSouth continued to pay the ground rent on the property.
Falcon sued HealthSouth on June 4, 1997, claiming that HealthSouth owed $7,167,724.24 for breaching the contract by failing to provide plans and specifications and an additional $7,167,724.24 on an "account stated." The case was tried to a jury. HealthSouth moved for a judgment as a matter of law ("JML") on both counts at the close of the plaintiff's evidence. The trial court granted the motion as to the "account-stated" count of Falcon's complaint; however, it denied the motion as to the remaining count. HealthSouth renewed its motion for a JML at the close of all the evidence; the court denied the renewed motion. The jury returned a verdict in favor of Falcon in the amount of $2,228,727. The trial court entered a judgment upon that verdict. HealthSouth timely moved for a JML, or, in the alternative, a new trial. The trial court denied the motion, and HealthSouth appealed.

Analysis
Because this appeal arises from a judgment based on a jury verdict, we "must consider the evidence in a light most favorable to the prevailing party and must set aside the verdict only if it is shown to be plainly and palpably wrong." Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344, 345 (Ala.1992) (citation omitted). A jury's verdict is presumed to be correct, and that presumption of correctness is strengthened by the trial court's denial of a motion for a new trial. Transport Acceptance Corp. v. Vincent, 521 So.2d 976 (Ala.1988).
HealthSouth asserts (1) that HealthSouth was entitled to a JML on Falcon's claim that HealthSouth breached the sublease by failing to provide plans and specifications; (2) that Falcon's claim that HealthSouth had repudiated the contract cannot be maintained absent a clear, unqualified refusal by HealthSouth to perform and evidence of compensable damage; (3) that Falcon failed to prove any damage for which it could recover; (4) that *182 Falcon could not maintain its claim of default without having strictly complied with the applicable default provisions of the sublease contract; (5) that the trial court erred in holding that Falcon was not required to reduce its claim for accelerated improvements rent to present value; (6) that the accelerated rent provision constituted a penalty and, therefore, was void and unenforceable; (7) that the trial court erroneously charged the jury on the issue of mitigation of damages regarding the future use of the land; and (8) that the trial court committed prejudicial error in allowing the introduction of evidence concerning offers of compromise and settlement.
First, HealthSouth argues that it was entitled to a JML because, it says, it did not breach the sublease agreement by failing to provide plans and specifications. We disagree. To establish a breach of contract, Falcon was required to prove (1) a valid contract that bound the parties in the action, (2) Falcon's performance under the contract, (3) HealthSouth's nonperformance, and (4) damage. See Southern Med. Health Sys. v. Vaughn, 669 So.2d 98, 99 (Ala.1995).
The parties do not seem to dispute that the sublease was a valid contract. Rather, HealthSouth argues that nonperformance by Falcon led it not to provide the plans and specifications as required under the contract. The evidence at trial was undisputed that Falcon, not HealthSouth, was the party that contracted with the architect, Gould Turner, to provide the plans and specifications for the proposed building. Although the architect testified that only Falcon had the right to control or stop Gould Turner's work on the project, Falcon presented testimony indicating that HealthSouth approved any plans drawn by Gould Turner; instructed Gould Turner on several occasions to stop work, without input from Falcon; and, along with Gould Turner, agreed to keep some information about the project from Falcon.
Additionally, HealthSouth asserts that it did not breach the sublease because, it says, it had presented plans and specifications from which a shell building could have been constructed as early as August 1995. Falcon disputed this claim at trial, arguing that the drawings were inadequate for construction of the shell building because they lacked certain steel-shop drawings and bar-joist drawings. HealthSouth seems to concede that the drawings were adequate only for construction of the shell building and that they included no plans or specifications for the tenant build-outs. Additionally, Falcon argues that HealthSouth never provided plans for the part of the building that it intended to occupy. Because evidence of Falcon's performance and the alleged nonperformance of HealthSouth was disputed, HealthSouth was not entitled to a JML on the breach-of-contract claim. Therefore, the trial court correctly submitted Falcon's breach-of-contract claim to the jury.
HealthSouth further contends that Falcon's claim that HealthSouth had repudiated the sublease cannot be maintained because, it says, HealthSouth made no clear, unqualified refusal to perform. Alabama law is well settled that repudiation may be proven only where words or acts evince "`an intention to refuse performance within the future time allowed by the contract.'" Shirley v. Lin, 548 So.2d 1329, 1334 (Ala.1989) (quoting Draughon's Bus. Coll. v. Battles, 35 Ala.App. 587, 590, 50 So.2d 788, 790 (1951) (emphasis added in Shirley)). Essentially, repudiation must amount to an unqualified refusal or declaration of inability to substantially perform the duties outlined in the contract. Box v. Metropolitan Life Ins. Co., 232 Ala. 447, 168 So. 220, 222 (1936). Once a repudiation *183 of the contract is made, the nonrepudiating party is relieved from performing any further contractual obligations. Rosenfeld v. City Paper Co., 527 So.2d 704, 705 (Ala.1988).
Falcon argues that a repudiation by HealthSouth occurred in the January 1997 meeting between Darryl Brown of HealthSouth and John Plott of Falcon. In that meeting, Brown restated HealthSouth's position that it would be unable to proceed with the building without first securing a subtenant agreement for the remaining space in the building.[3] Although HealthSouth argues that it never refused to go forward with construction of a building within the cost range originally contemplated by the parties, that cost range was merely an estimate. The lease indicates that the parties knew that the costs could vary; it stated that rent would be adjusted once the actual costs were ascertained. HealthSouth negotiated no lease provision that would excuse its performance if the costs escalated far above the estimated cost. Because Falcon presented evidence indicating HealthSouth refused to perform its contractual obligations, the jury could have found that HealthSouth had repudiated the lease, thereby relieving Falcon of any further obligations under the lease.
HealthSouth additionally argues that the judgment based on the verdict is due to be reversed because Falcon sought damages only for accelerated improvements rent, which HealthSouth argues is not a recoverable item of damage. Alabama law is well settled that the damages awarded in an action for breach of contract should be an amount sufficient to return the nonbreaching party to the position he would have occupied had the breach not occurred. Aldridge v. Dolbeer, 567 So.2d 1267, 1269 (Ala.1990). "[T]he damages claimed must be `the natural and proximate consequences of the breach and such as may reasonably be supposed to have been within the contemplation of the parties at the time the contract was made.'" Aldridge, 567 So.2d at 1269-70 (citations omitted).
Although HealthSouth contends that Falcon could not recover damages for rent on a building that was never built, it does not address the fact that it was HealthSouth's breach that prevented the construction of the building. The lease provided that improvements rent would be calculated and would become due and payable upon construction of the building and its being certified for occupancy. This would have occurred but for HealthSouth's failure to present plans and specifications from which a building could have been constructed. The lease further provided for acceleration of any and all rents upon default of the lessee. Thus, the damages sought by Falcon were intended to place it in the position it would have occupied had HealthSouth provided the plans and specifications as outlined in the sublease. Additionally, the damages sought were within the contemplation of the parties at the time they entered the lease. Therefore, the damages claimed by Falcon and awarded to it were recoverable.
HealthSouth next asserts that Falcon is not entitled to relief because, it says, Falcon failed to strictly comply with *184 the applicable provisions of the lease concerning default. Provisions in a lease that require a lessor to provide written notice of any default, as well as an opportunity to cure the alleged default, are conditions precedent to the lease and must be pleaded and proved. Noel Smith Dev. Co. v. National Filtronics, Inc., 360 So.2d 338, 340 (Ala.1978); see also Arlen Realty, Inc. v. Dozier, 393 So.2d 489, 491 (Ala.Civ.App. 1980). To recover for default where the lease requires written notice of default, the notice given must be in strict compliance with the terms of the lease, both as to time and contents. Arlen Realty, 393 So.2d at 491.
Paragraph 23 of the Falcon-HealthSouth lease contained the provisions for declaring default. It provided that upon HealthSouth's failure to comply with the terms of the lease, for Falcon to declare a default it must give "written notice of not less than forty-five (45) days," within which HealthSouth could cure the default. If the alleged default was not cured within 45 days, then Falcon had the right to reenter or to relet the property. Additionally, the lease provided that Falcon had the right to immediately declare due and payable the balance of any and all rent payable for the lease term.
HealthSouth contends that Falcon failed to strictly comply with the default provision of the lease; specifically, it says, Falcon did not properly accelerate the improvements rent. HealthSouth argues that Falcon was required first to provide HealthSouth written notice of nonpayment and then to allow it 30 days within which to pay the amount. However, HealthSouth's reading of the default provision is erroneous. The lease specifically states:
"Upon the tenant's failure to pay the rent after thirty (30) days following the receipt of written notice of non-payment, or upon its failure to comply with the covenants and terms of the lease, after being given written notice of not less than forty-five (45) days from the lessor, and tenant's failure to cure the default within the forty-five (45) days or to commence to cure and thereafter proceed with such cure with reasonable diligence, or if the tenant shall abandon the premises or if execution or other legal process is levied upon the interest of the tenant in this lease, or if a petition in bankruptcy is filed by or against the tenant, or an assignment for the benefit of creditors is made by tenant or if a [receiver] of tenant's property is appointed, or if [tenants] use or permit any part of the premises to be used for an immoral or illegal purpose, then upon the happening of one or more of said events, the lessor at its option may terminate this lease, re-enter and take possession and re-let the premises."
(Emphasis added.)
Because HealthSouth's failure to comply with the lease terms, rather than nonpayment, was the cause of the default, Falcon was required to give written notice of default and to allow 45 days for HealthSouth to cure. Falcon complied with the lease terms. Falcon first notified HealthSouth on August 26, 1996, that it was in default for failure to provide plans and specifications; at that time Falcon gave HealthSouth an additional 90 days to provide the requisite plans and specifications. After further correspondence, Falcon formally notified HealthSouth, on November 27, 1996, that it was in default and allowed HealthSouth 45 days to cure. Finally, Falcon's letter of January 24, 1997, declared HealthSouth to be in default and demanded the accelerated improvements rent. Although the first default letters did not make a demand for accelerated improvements rent, no provision in the lease required Falcon to make such a demand. *185 The lease merely required written notice of default, along with a 45-day period within which HealthSouth could cure the default. Falcon strictly complied with the lease in declaring HealthSouth's default; therefore, it was not barred from recovery.
HealthSouth also argues that this judgment should be reversed because, it argues, the trial court did not require Falcon to reduce its claim for future improvements rent to present value. We agree. To support its proposition, HealthSouth cites Scientific American Compiling Department v. Gillespie, 4 Ala.App. 590, 58 So. 756 (1912), a case decided by the Court of Appeals. Gillespie concerns accelerated payments due under an installment contract for the purchase of books. The Court of Appeals stated that because some of the payments were not yet due, the money to be received for those payments must be reduced to present value.
Although our caselaw requires a lessor to deduct any costs he avoided by not having to perform his contractual obligations, from any accelerated rent received as damages in an action for breach of a lease agreement, see Watts Bldg. Corp. v. Schoel, Ogle, Benton, Gentle & Centeno, 598 So.2d 832 (Ala.1992), this Court has never addressed the question whether a lessor is required to reduce the amount of accelerated rent he receives for such a breach to its present value. Because our caselaw has consistently required that future damages be reduced to present value, it is fitting to require a lessor to reduce to present value any amount of rent recovered that would have been due at a future time. Accordingly, we hold that the trial court erred by not requiring Falcon to reduce to present value the amount of accelerated rent recovered.
During the trial of this case, the court prevented HealthSouth from presenting evidence regarding the present value of the accelerated improvements rent Falcon was claiming. The court also refused several requested jury charges regarding reduction of the accelerated improvements rent to present value. Because reduction of an award of future damages to present value is within the province of the jury, see J.F.P. Offshore, Inc. v. Diamond, 600 So.2d 1002, 1004 (Ala.1992), the trial court erred by excluding evidence of the present value of the accelerated improvements rent claimed by Falcon.
HealthSouth also argues that the accelerated-rent provision constitutes a penalty and is therefore void and unenforceable. However, accelerated-rent clauses have been held valid under Alabama law. Watts Bldg. Corp. v. Schoel, Ogle, Benton, Gentle & Centeno, 598 So.2d 832 (Ala.1992); Maddox v. Hobbie, 228 Ala. 80, 152 So. 222 (1934). "[A] penalty is characterized as a security for the performance of the agreement or as a punishment for default." Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So.2d 987, 990 (Ala.1987). In Camelot Music, this Court held that a liquidated-damages clause did not constitute a penalty if the recovery provided was reasonably related to the loss that resulted from the breach of the lease. Camelot Music, 514 So.2d at 991. Likewise, if an accelerated-rent clause provides for a recovery that is approximately what the parties could have reasonably expected the lessor to suffer in the event of a breach, it is valid. Cf. Camelot Music, 514 So.2d at 991. Because Falcon could have expected to receive its rents over the term of the lease, the accelerated-rent clause is not void and is enforceable under Alabama law.
*186 HealthSouth further argues that the trial court erroneously charged the jury on Falcon's duty to mitigate the damage it suffered as a result of HealthSouth's breach. Under Alabama law, "`[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.'" King v. W.A. Brown & Sons, Inc., 585 So.2d 10, 12 (Ala.1991) (quoting Nunn v. Whitworth, 545 So.2d 766, 767 (Ala.1989)). When an objection to a jury charge has been properly preserved for review on appeal, as this one was, we look to the entirety of the jury charge to see if there was reversible error, and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12.
With regard to mitigation of damages, the trial court first charged that HealthSouth had presented evidence regarding the marketability of the property. It then stated:
"Should you find from the evidence that the defendants repudiated the lease, the plaintiffs' further performance would be excused and, under the acceleration clause of the lease, all future rents would be due and payable less costs associated with construction of the building and the defendants would have the use of the premises during the term of the lease, therefore, the plaintiffs would have no duty to market the property in mitigation of damages."
Later in its charge to the jury, the court instructed the jury that it was the duty of a damaged party to exercise ordinary care to reduce his damages, and that the injured party is "bound to exercise such care as a reasonably prudent person would exercise under like circumstances to reduce or mitigate damages." Finally, the trial court stated that an injured party could recover damages only for the harm he would have sustained had he exercised such care.
Falcon argues that the trial court's charge was not erroneous and that the charge followed the law established by this Court in Watts Building Corp., supra. In Watts Building Corp., this Court held that a lessor is obligated to mitigate its damages, but stated: "`However, if the landlord is unable to secure a substitute tenant... or if the premises have been rendered unmarketable, the [lessor] is entitled to an amount equal to the full amount of rent reserved in the lease, plus any other consequential damages,'" less any avoided costs. Watts Bldg. Corp., 598 So.2d at 834-35 (quoting Schneiker v. Gordon, 732 P.2d 603, 612 (Colo.1987)).
HealthSouth contends that it presented evidence indicating that the property had significant commercial value and that it had made an unconditional offer to cancel its interest in the sublease so that Falcon might relet the property. Conversely, Falcon insists that it had no duty to market the property upon HealthSouth's repudiation of the contract. We disagree with Falcon on this point. Although Falcon argues that the trial court properly applied Watts Building Corp., supra, that case is distinguishable from this case. In Watts Building Corp., the landlord accelerated the rent due on the office space, did not attempt to mitigate his damages, and instead held the office space open in the event the tenant wished to reoccupy it during the lease term. In the instant case, no improvement or building existed that HealthSouth could have occupied. While the trial court's charge to the jury allowed for waste, we cannot say that the charge as a whole amounted to prejudicial error.
Finally, HealthSouth contends that the trial court committed prejudicial error by allowing into evidence a March 3, 1997, letter from Dr. Leslie Fowler to *187 HealthSouth. HealthSouth contends, and Falcon does not appear to dispute, that the letter constituted an offer of compromise or settlement that occurred before trial. Specifically, the letter stated that Dr. Fowler would be willing to recommend that Falcon lease 12,000 square feet of any building constructed on the property, regardless of whether MedPartners was a party to the lease.
Falcon tried three times during the trial to have the letter admitted into evidence, but the court repeatedly determined that the letter was excluded by Rule 408, Ala. R. Evid. The court eventually allowed the letter to be introduced into evidence, not as an offer of compromise or settlement, but as evidence that directly refuted a statement of HealthSouth witness Norma English. English had testified that Dr. Fowler would not have leased property in the HealthSouth building because he had committed to moving his practice into a building to be constructed by MedPartners. Thus, the evidence was introduced to refute those statements, and the trial court gave a limiting instruction to the jury. The trial court stated that the letter was not admitted to prove the truthfulness of anything contained in the letter, but was admitted merely for the limited purpose of rebutting the testimony of English. The trial court is afforded broad discretion in determining the admissibility of evidence, and we conclude that the trial court did not abuse its discretion in admitting the letter into evidence.

Conclusion
We affirm the judgment insofar as it imposes liability, but, because the judgment did not reduce to present value the accelerated improvements rent Falcon was claiming, we must reverse the judgment insofar as it sets the amount of damages. We remand the case for the trial court to determine the present-value amount of the accelerated improvements rent claimed by Falcon, and we instruct the trial court to enter an order conditionally denying HealthSouth's motion for a new trial, based on Falcon's accepting the present-value amount.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
HOUSTON, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
SEE and LYONS, JJ., concur in the result.
MOORE, C.J., and WOODALL, J., dissent.
WOODALL, Justice (dissenting).
I dissent from the majority decision to "reverse the judgment insofar as it sets the amount of damages" and directs the trial court "to determine the present-value amount of the accelerated improvements rent claimed by Falcon." 799 So.2d at 187.
The contract between these parties divided rent into two partsground rent and improvements rent. Ground rent commenced on February 1, 1995. The contract did not provide a specific date for the commencement of improvements rent, but stated:
"The improvements rent shall commence when construction of the improvements is completed to the extent that the improvements are ready for occupancy as determined by the City of Tuscaloosa. Such date will be reflected in an addendum to this lease executed by the parties at that time."
Of course, it is undisputed that the "improvements" were never completed and that, therefore, HealthSouth never commenced the payment of improvements rent.
*188 The contract gave Falcon certain rights where HealthSouth failed to comply with the contract. The acceleration of rent clause provided: "Lessor shall also have the right to immediately declare the balance of any and all rent due and payable under the lease term immediately due and payable." (Emphasis added.) That clause does not allow the acceleration of improvements rent under the facts of this case. No improvements rent is "due and payable," because such rent was not to commence until construction of the improvements was completed. Also, the contract does not provide for the acceleration of only one of the two types of rent provided for in the contract.
This Court should reverse and remand this case for a new trial, where Falcon can present a proper theory of damages. See Med Plus Props. v. Colcock Constr. Group, Inc., 628 So.2d 370 (Ala.1993).
NOTES
[1] Southeastern Investment Group, a company consisting of John Plott, Dr. Leslie Fowler, and various other investors, owned the property that was the subject of the sublease, and had leased it to Falcon on May 27, 1994. Falcon is a joint venture between HHH Holding Company and Quad B Holding Company. HHH Holding Company is owned by the children of John Plott and Quad B Holding Company is owned by Madeline Fowler, as trustee for the children of Dr. Leslie Fowler and Madeline Fowler.
[2] At trial, the HealthSouth representatives, as well as Dr. Fowler, Plott, and the architects, testified that from the time of negotiations for the construction of the building through the design phase, HealthSouth never desired or intended to be responsible for leasing more than 6,000 square feet of the building.
[3] As early as December 15, 1995, HealthSouth stated that its ability to move forward with the project was dependent upon its having tenants willing to lease and occupy the additional space. This position was further stated in HealthSouth's October 25, 1996, response to the original default letter; in that response, Darryl Brown wrote that HealthSouth could not agree to lease any space from Falcon until a sublease had been secured with MedPartners for the additional space.