Rel: February 20, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2024-0713

_____

### Mark Weaver

v.

### Frios Gourmet Pops, LLC, Frios Manufacturing, LLC, Andy Harp, and Kevin Harper

### Appeal from Etowah Circuit Court
### (CV-20-900125)

STEWART, Chief Justice.

Mark Weaver appeals from a judgment entered by the Etowah Circuit Court ("the trial court") awarding him damages against Frios Gourmet Pops, LLC, Frios Manufacturing, LLC, Andy Harp, and Kevin

Harper (referred to collectively as the "Frios defendants") for the breach of a commercial lease. Weaver contends that the trial court erred in limiting his damages to the rent that had accrued at the time Weaver terminated the Frios defendants' tenancy and reentered the premises. For the following reasons, the judgment is reversed, and the cause is remanded for further proceedings.

<u>Facts and Procedural History</u>

In April 2016, Harp, as the managing member of Frios Gourmet Pops, LLC, and Weaver entered into a 10-year lease agreement ("the lease") for a commercial property that Weaver owned in Gadsden ("the property"). Harp leased the property from Weaver to expand his gourmet-popsicle company, Frios Gourmet Pops, which he operated in downtown Gadsden. Under the lease, the parties agreed that Frios Gourmet Pops would pay Weaver $4,800 per month to rent the property. Harp also signed as a personal guarantor of the lease. The lease contained the following provisions regarding default:

"<u>Events of Default</u>

"12.01.    Any one or more of the events listed in sub-paragraphs (a) through (c) of this Paragraph 12.01 shall constitute a default under this Lease.

"(a) Lessee's failure to pay rent when due ….

" ….

"Notice of Election to Terminate Lessee's Possession

"12.02. … [I]f a default occurs the Lessor may elect to terminate Lessee's right of possession under this Lease after ten (10) days from the date of mailing of notice of the election to Lessee. If this notice is given, all of Lessee's rights, title, and interest in the Premises shall expire completely at the expiration of the ten (10) days, and Lessee shall quit and surrender the Premises and any improvements erected on the Premises to Lessor.

"Lessor's Entry After Termination of Lessee's Possession

"12.03. At any time after the termination of Lessee's right of possession under this Lease pursuant to Paragraph 12.02 of this Lease, Lessor may enter and possess the Premises and Improvements by summary proceedings, ejectment, or otherwise, and Lessor may remove Lessee and all other persons and property from the Premises and Improvements. If Lessor takes the actions described in this Paragraph 12.03, Lessor may then possess the Premises and Improvements and assume the right to receive all rents, income, and profits from the Premises and Improvements, and Lessor may also sell any of the improvements.

"Lessee's Liability for Accrued Rent

"12.04. The expiration of this Lease or termination of Lessee's right of possession pursuant to Paragraphs 12.01 or 12.02 of this Lease shall not relieve Lessee of its liability and obligation to pay the rent and any other charges accrued prior to these events, or relieve Lessee of liability for damages for breach. These liabilities and obligations of Lessee shall

survive any expiration or termination of the Lease or any entry and possession by Lessor.

"Reletting Land and Improvements

"12.05. After the termination of Lessee's right of possession under this Lease pursuant to Paragraph 12.02, Lessor shall use reasonable efforts to mitigate damages by re-letting the Premises and Improvements, in whole or in part, either in its own name or as agent of Lessee, for a term or terms that, at Lessor's option, may be for the remainder of the then-current Term of this Lease or for any longer or shorter period. If Lessor re-lets the Premises for any longer period, Lessee shall not be liable for such period that exceeds the then-current Term. Notwithstanding the foregoing, nothing herein shall prohibit Lessee from attempting to re-let the Premises.

"Rent from Reletting

"12.06. Lessee shall be entitled to a credit, towards the damages caused or suffered as a result of the Lessee's breach of the lease agreement, if the rent received on reletting exceeds the rent required pursuant to the Lease. Furthermore, the Lessee shall remain liable for the difference between the rent reserved under this Lease, and the rent collected and received, if any, by Lessor during the remainder of the unexpired term, but not any subsequent option period.

"Cost Incurred Due to Breach

"12.07. Lessee expressly agrees to pay all expenses that Lessor may incur for reasonable attorney fees or brokerage commissions, and all other reasonable costs paid or incurred by Lessor for enforcing the terms and provisions of the Lease, and in the event of termination thereof because of a default by the Lessee, reletting the Premises and Improvements, restoring the Premises and Improvements to good order and

4

condition, altering, decorating, repainting or otherwise repairing the same for reletting, and for maintaining the Premises and Improvements prior to any reletting."

In July 2018, Harp assigned all the interest and rights under the lease from Frios Gourmet Pops, LLC, to Frios Manufacturing, LLC, and brought on Kevin Harper as a business partner. Weaver consented to the assignment and executed a written agreement with Harp. Weaver also executed a guaranty agreement with Harper.

At the end of 2018, Harp sold his gourmet-popsicle business in an asset-only sale to a company based out of Mobile. That company continued to use the property for operations until early 2019, at which point the company moved the business from Gadsden. Harp began searching for a new tenant for the remainder of the lease term. During that time, Harp was introduced to Merwyn Harrison and his wife, Lee Ann Harrison, who owned Gardens on Air, LLC. Gardens on Air was a farming business that specialized in hydroponic growing, which is a method of growing plants without soil. Harp started investing in Gardens on Air and eventually became a co-owner of the business. Harp planned to work with the Harrisons to grow specific types of microgreens and supply them to supermarkets across the Southeast.

Shortly after becoming a co-owner of Gardens on Air, Harp began the process of establishing the business at the property, which included moving a greenhouse and other supplies and materials onto the property. Harp continued to pay rent to Weaver under the lease, using both personal checks and business checks with Gardens on Air's name on them. Although Gardens on Air had established operations at the property, the parties never executed a written assignment agreement.

In July 2019, Harp's business venture with Gardens on Air ended, and Harp posted a "for rent" sign outside the property to find a new tenant who could sublease the property. Harp also contacted Weaver and asked to be released from the lease, but Weaver refused. Weaver continued to receive rent from Harp through October 2019. Harp did not pay the rent for November and December. During that time, Harp provided Weaver with the name and contact information of a potential tenant, but Weaver informed Harp that he would not approve of a new tenant until Harp paid the past-due rent.

On January 6, 2020, Weaver, through his counsel, sent Harp a letter notifying him that the Frios defendants owed more than $13,000 in past-due rent, property taxes, and related late fees for November 2019

6

to January 2020. The letter cited various sections of the lease and outlined what actions Weaver could take upon a default. For example, the letter cited § 12.02 of the lease, which provides that "if a default occurs the Lessor may elect to terminate Lessee's right of possession" of the property 10 days after mailing written notice. The letter also cited § 12.04 and § 12.05 of the lease, which outline the Frios defendants' liability to Weaver for a default. Weaver's letter further explained that, under § 12.06 and § 12.07 of the lease, the Frios defendants would be liable to Weaver for certain damages for a default. Harp received Weaver's letter outlining the above provisions on January 8, 2020, but he did not make any rent payments.

On January 28, 2020, Weaver sent Harp a letter notifying Harp that he was terminating the Frios defendants' right of possession pursuant to § 12.03 and § 12.04 of the lease. The Frios defendants' last day occupying the premises was February 29, 2020.

After Weaver regained possession of the property, he contacted a commercial realtor to help find a new tenant, posted a "for lease" sign outside the property, and listed the property online. Weaver relet the property to a new tenant in December 2021. Under the lease with the

new tenant, Weaver received $4,000 a month in rent. Weaver sold the property in August 2022.

Weaver commenced an action in the trial court on February 21, 2020, alleging damages in the amount of $23,653.61 for the Frios defendants' failure to pay rent from November 2019 through February 2020. Over the course of the litigation, Weaver amended his complaint several times, seeking additional damages for unpaid rent, for the difference in rent reserved under the lease and the rent collected from the new tenant, for late fees, for unpaid property-insurance premiums, and for unpaid property taxes. In all, Weaver alleged a total of $150,959.76 in damages, plus interest and attorney's fees, as the result of the breach of the lease.

The Frios defendants moved for a summary judgment, arguing that Weaver was not entitled to damages because the performance of the lease became impossible when the buyer of Harp's gourmet-popsicle business moved operations away from Gadsden. Alternatively, the Frios defendants contended that if Weaver was entitled to damages, he was limited under § 12.04 of the lease to seeking damages only for the rent that had accrued before, they say, he terminated the lease on January

28, 2020. The Frios defendants further argued that Weaver could not recover as liquidated damages rent that accrued after January 2020 because the lease did not contain an acceleration clause.

Weaver responded to the Frios defendants' motion and also moved for a summary judgment, arguing that the Frios defendants remained liable for rent payments after business operations ended at the property because the affirmative defense of impossibility has not been recognized in Alabama. Weaver additionally argued that he terminated the Frios defendants' right of possession under the lease, and not the lease itself, and that under § 12.04 through § 12.07, he was entitled to recover the rent payments that accrued after February 2020.

The trial court denied Weaver's summary-judgment motion and entered a partial summary judgment in favor of the Frios defendants. In its order, the trial court quoted a portion of § 12.04 and concluded:

> "1. The Court finds that [Weaver] unilaterally terminated the lease agreement between the parties on January 28, 2020.
>
> "2. The provisions of said lease agreement do not contemplate the accrual of damages for breach post-termination. In fact, the Court takes note that section 12.04 of said lease agreement contemplates 'rent and other charges accrued prior to ….'"

9

Without stating any other rationale, the trial court determined that Weaver's damages were limited to his original stated claim of $23,623.61.[1]

The Frios defendants also filed a motion in limine, seeking to preclude Weaver from introducing at trial testimony or evidence of any damages other than the amount of rent accrued at the time of the termination of the Frios defendants' tenancy. The trial court granted the motion in limine and "barred [Weaver] from introducing testimony and evidence of damages in excess of $23,623.61."

The trial court conducted a bench trial in April 2024. On June 21, 2024, the trial court entered a final judgment in favor of Weaver and against the Frios defendants in the amount of $34,351.75 "for unpaid rents, interest and attorney's fees."[2] On July 22, 2024, Weaver filed a postjudgment motion, pursuant to Rule 59, Ala. R. Civ. P., asking the

---

[1]Weaver's original stated claim for damages was $23,653.61.

[2]Before trial, Harp filed a third-party complaint against the Harrisons and Gardens on Air, LLC, asserting claims of fraud and misrepresentation. Those claims were also tried at the April 2024 bench trial, and the trial court entered a judgment in favor of Harp and against the Harrisons in the amount of $68,000. That judgment was not appealed and is not before this Court.

trial court to amend its judgment, or alternatively, to grant a new trial. In his motion, Weaver argued that the lease permitted recovery of additional damages beyond the rent accrued before termination of the Frios defendants' right of possession. Weaver's motion was denied by operation of law on September 20, 2024. This appeal followed.[3]

Standard of Review

"When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error." Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996). However, when "the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court's judgment carries no presumption of correctness." Id. Accordingly, we apply a de novo standard of review. Id.

---

[3]The Frios defendants argue that Weaver's appeal should be dismissed as untimely because he did not appeal from the trial court's summary-judgment order. The trial court's order limiting Weaver's damages, however, was not a final judgment capable of being appealed. Weaver filed his notice of appeal within 42 days of the date his post-judgment motion was denied by operation of law. Accordingly, Weaver's appeal was timely. See Rule 54(b), Ala. R. Civ. P.

<u>Analysis</u>

On appeal, Weaver argues that the trial court erred in concluding as a matter of law that the lease did not permit Weaver to recover damages for the period following the termination of the Frios defendants' possession of the property and that, therefore, it also erred in excluding evidence of such damages at trial. Weaver contends that, notwithstanding his recovery of the possession of the property, the lease provided for liquidated damages and other posttermination damages.

It is the general rule that a landlord may recover only rent that has accrued at the time of the termination of the tenancy. <u>See,</u> <u>e.g.,</u> <u>Hardin v. Kirkland Enters., Inc.</u>, 939 So. 2d 40, 42 (Ala. Civ. App. 2006) (quoting 49 Am. Jur. 2d <u>Landlord & Tenant</u> § 1012 (1995)) ("'After the dispossession of a tenant in summary proceedings for nonpayment of rent, the lease is at an end, and the tenant's liability thereafter is for damages, not further rent payments.'"); <u>Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc.</u>, 873 So. 2d 1091, 1104-05 (Ala. 2003) (plurality opinion) (affirming trial court's denial of landlord's claim for "future rent" following termination of lease); and Jenelle Mims Marsh, <u>Alabama Law of Damages</u> § 28:19 (6th ed. 2012). Thus, reentry onto the premises

ordinarily terminates the tenancy and extinguishes the tenant's liability for future rent. See Ex parte Kaschak, 681 So. 2d 197, 200 (Ala. 1996) ("[W]hen a tenant abandons leased premises the landlord has two options. First, the landlord may allow the premises to remain vacant and recover rent for the whole term of the lease, or the landlord may end the lease by accepting the abandoned property and re-entering the premises."), and Deming v. Scoville, 220 Ala. 424, 425, 125 So. 683 (1930) ("[W]here … the landlord re-enters and resumes the beneficial use and enjoyment of the premises, he thereby terminates the lease in so far as his right to recover subsequently accruing rent is concerned."). However, this Court has recognized that parties to a lease may contractually agree that a defaulting tenant must pay liquidated damages in an amount equal to the value of the unpaid future rent. See Camelot Music, Inc. v. Marx Realty & Improvement Co.,514 So. 2d 987, 990 (Ala. 1987).[4]

---

[4]This Court has also enforced rent-acceleration clauses, see HealthSouth Rehabilitation Corp. v. Falcon Management Co., 799 So. 2d 177, 185 (Ala. 2001), as well as a provision granting a landlord the right to reenter an abandoned premises without terminating the lease. Paradigm Inv. Grp., LLC v. Brazelton, 353 So. 3d 1136, 1139 (Ala. 2021). There are no such provisions at issue in this case.

In <u>Camelot</u>, a commercial tenant in a shopping mall moved out of the leased premises before the end of the lease term and discontinued paying rent, as required by its lease. The lease contained a liquidated-damages provision that provided as follows:

> "'In case of any such default, re-entry, expiration and or dispossession by unlawful detainer proceedings or otherwise … (c) Tenant … shall also pay landlord, as liquidated damages for the failure of tenant to observe and perform said tenant's covenants herein contained, any deficiency between the rent hereby reserved and or covenanted to be paid and the net amount, if any, of the rents collected on account of the lease or leases of the leased premises for each month of the period which would otherwise have constituted the balance of the term of this lease. In determining the rent which would be payable by tenant hereunder, subsequent to default, the annual rent for each year of the unexpired term shall be equal to the average of the fixed minimum and percentage rents paid by tenant from the commencement of the term to the time of default, or during the preceding three full calendar years, whichever period is shorter.'"

514 So. 2d at 990. The landlord sued the tenant, seeking, among other things, liquidated damages representing the amount of rent the landlord would have received had the tenant not breached the lease. The trial court in <u>Camelot</u> entered a judgment in favor of the landlord, which included such damages. On appeal, this Court affirmed the judgment, concluding that the above-quoted provision was valid and that it supported the judgment for the landlord.

14

In this case, Weaver argues that, as in Camelot, the lease's default provisions provide for liquidated damages representing the value of reserved rent for the period following his reentry onto the property. The Frios defendants dispute his contention, arguing that the default provisions should not be construed as providing for "liquidated damages" and noting that § 12.04 of the lease limits the obligation to pay rent and any other charges to those "accrued prior to" termination of the tenancy. The trial court agreed with the Frios defendants and, citing § 12.04, concluded that the lease did not contemplate any posttermination damages. We disagree.

"'"It is well settled that lease agreements are contracts and that the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement."'" New Gourmet Concepts, Inc. v. Siedo Invs. Co., 988 So. 2d 961, 965 (Ala. 2007) (quoting Hardin, 939 So. 2d at 44, quoting in turn Bowdoin Square, 873 So. 2d at 1098). We have explained that, under the rules of contract construction,

> "'[t]he intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning),

15

then the court will presume that the parties intended what they stated and will enforce the contract as written. On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. See [Voyager Life Ins. Co. v.] Whitson, 703 So. 2d [944,] 948 [(Ala. 1997)]. Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. See id. at 948-49; Sullivan, Long & Hagerty v. Southern Elec. Generating Co., 667 So. 2d 722, 725 (Ala. 1995).'"

Once Upon a Time, LLC v. Chappelle Props., LLC, 209 So. 3d 1094, 1097 (Ala. 2016) (quoting Homes of Legend, Inc. v. McCollough, 776 So. 2d 741, 746 (Ala. 2000)).

In this case, the default provisions in the lease are similar to the liquidated-damages provision at issue in Camelot. Section 12.06 of the lease provides that, upon the lessee's breach of the lease, "Lessee shall remain liable for the difference between the rent reserved under this Lease, and the rent collected and received, if any, by Lessor during the remainder of the unexpired term." Section 12.07 of the lease further provides that, if the lease is terminated because of a default by the lessee, the lessee "agrees to pay … reasonable costs paid or incurred by Lessor" in repairing, maintaining, and improving the premises for reletting.

16

Furthermore, § 12.04 states that the lessee's obligation to pay accrued rent and "damages for breach" survive the "termination of the Lease or any entry and possession by Lessor".[5] These provisions, read together with the other default provisions, evidence an agreement obligating the Frios defendants to pay certain damages as a result of default, notwithstanding a termination of the tenancy and a reletting of the property by Weaver.

Alternatively, the Frios defendants argue that, even if the lease contemplated posttermination damages, the default provisions at issue should be construed as providing a penalty and, thus, should be void as against public policy. In Camelot, this Court discussed various factors to consider in determining whether a liquidated-damages provision is valid

---

[5]Section 12.04 states, in part, that "[t]he expiration of this Lease or termination of Lessee's right of possession pursuant to Paragraphs 12.01 or 12.02 of this lease shall not relieve Lessee of its liability and obligation to pay the rent and any other charges accrued prior to these events, or relieve Lessee of liability for damages for breach." Rather than limiting recovery of all posttermination damages, this sentence appears to simply recognize the general rule in Alabama that, after the termination of the tenancy, rent no longer accrues and "'the tenant's liability thereafter is for damages, not further rent payments.'" Hardin v. Kirkland Enters., Inc., 939 So. 2d 40, 42 (Ala. Civ. App. 2006) (quoting 49 Am. Jur. 2d Landlord & Tenant § 1012 (1995)). Thus, the trial court's reliance on this clause to limit Weaver's damages to rent accrued at the time of the termination of the tenancy was incorrect.

and does not constitute a penalty provision. 514 So. 2d at 990 ("First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach [estimate] of the probable loss."). The Camelot Court held that the provision in that case did not constitute a penalty provision because the recovery provided for was reasonably related to the loss that resulted from the breach of the lease. 514 So. 2d at 991 ("Because the liquidated damages assessed here are those that [the lessee] reasonably could have expected to result from its breach of the contract, we hold that the liquidated damages clause of the contract was not a penalty …."). Similarly, in this case, the default provisions call for damages of a compensatory nature. Accordingly, we do not agree that the default provisions of the lease provide a penalty provision.

### Conclusion

Based on the above, we conclude that the trial court erred in concluding as a matter of law that the lease did not permit damages beyond the rent that had accrued at the time Weaver terminated the tenancy and in excluding any evidence relating to Weaver's claim for

18

posttermination damages at trial. Accordingly, the judgment of the trial court is reversed, and the case is remanded for a new trial or other further proceedings consistent with this opinion. We make no comment regarding the amount or calculation of posttermination damages, if any, due under the lease or regarding the evidence necessary to prove such a claim, and we do not address any other potential defense to Weaver's damages claim.

REVERSED AND REMANDED.

Shaw, Bryan, Mendheim, and McCool, JJ., concur.