The plaintiff, Interstate Investment Corporation ("Interstate"), appeals from a judgment for the defendant, Rose Care, Inc., in this action seeking a declaration of rights under a lease. We affirm.
On May 26, 1987, Rose Care, then known as Convalescent Rehabilitative Enterprises, Inc., leased the Lee Manor Health Care Center, a nursing home located in Opelika, Alabama, to Medical Service Investments, Inc., which later merged into Interstate. The 15-year lease provides that the monthly rent should be as follows:
 "The sum derived from the addition of the monthly principal and interest payment due under two Promissory Notes dated July 2, 1984, given by Lessor, the first to First America Federal Savings Bank of Fort Smith, Arkansas, and the second to Opelika Nursing Home, Inc., plus the sum of Two Thousand Dollars ($2,000). Payments hereunder shall be adjusted as the payments change under the terms of said Promissory Notes."
Rose Care's monthly payments under the Opelika Nursing Home note and, thus, that portion of the rent based on those payments are not in dispute. Nor does Interstate question the additional $2,000 in rent set out in the lease. The parties are at issue, however, as to how the remainder of the rent should be calculated.
The First America note provides, in pertinent part, as follows:
 "ACCRUAL OF INTEREST: Interest shall accrue from the date of disbursement of the principal, through July 2, 1985, on the unpaid principal balance due from time to time at the rate of 13.75% per annum. On July 2, 1985, and on each consecutive anniversary date therefrom until the indebtness is paid in full, the annual interest rate shall be adjusted to equal: (a) the weekly average yield on United States Treasury Securities adjusted to a constant maturity of one (1) year, as made available by the Federal Reserve Board Statistical Release H. 15; plus (b) 2.5%.
 "AMORTIZATION OF DEBT: Commencing August 2, 1984, and on the second day of each successive month thereafter until the entire indebtedness is paid in full, the Maker will pay to the Holder equal monthly installments of principal and interest payments (to be adjusted annually *Page 838 
to take into account the change in interest rate provided in Paragraph 1. above) as may be necessary to amortize the indebtedness in 240 monthly payments, provided however, that in any event, the entire indebtedness shall be due and payable on July 2, 1991, subject however, to prepayment as permitted in Paragraph 4 below, and subject to the acceleration under the terms of Paragraph 5 below."
On June 25, 1991, the Resolution Trust Corporation ("RTC") notified Rose Care that it had taken control of First America after the bank had become insolvent. The RTC reminded Rose Care that the First America note had a "balloon" provision and that the note would mature on July 2, 1991. The RTC requested payment of the balance on that date. Rose Care's vice-president and chief financial officer, J.A. Gilbreath, wrote a letter to the RTC explaining that Rose Care had had an understanding with First America that the loan would be refinanced; the letter stated:
 "[T]he untimely and unexpected failure of First America caught us by surprise, and unprepared. Rose Care has faithfully performed its obligation under the agreement and, heretofore, the bank has always refinanced the short term mortgages in accordance with the oral commitments that were given [to] us when the mortgages were entered into."
Pursuant to an agreement between Rose Care and the RTC, Rose Care continued to make the same monthly payments on the First America note after July 2, 1991, that it had been making before that date, and Interstate continued to make its rent payments based on Rose Care's payments. However, in April 1992, Rose Care was notified that Dickinson Financial Corporation ("Dickinson"), a bank holding company in Kansas City, Missouri, had purchased the First America note and mortgage from the RTC. Thereafter, Rose Care negotiated with Dickinson to refinance the debt. These negotiations ultimately resulted in an agreement between Rose Care and Community Bank, N.A., of Chillicothe, Missouri, a bank owned by Dickinson, extending and modifying the First America note. As a result of this refinancing agreement, Rose Care's monthly payments under the First America note increased. After Rose Care passed this increase along to Interstate in the form of a rent increase, Interstate filed this action seeking a judicial determination of the amount of rent that it was obligated to pay under this aspect of the lease. The trial court ruled that Interstate was obligated under the lease to make monthly payments to Rose Care equal to Rose Care's monthly payments to Community Bank under the refinancing agreement.
The basic positions of the parties can be summarized thusly: Interstate contends that the lease is unambiguous and by its terms limits its monthly rent payments to an amount equal to Rose Care's monthly payments under the First America note before that note was extended and modified. Interstate contends that Rose Care's refinancing of its debt should in no way affect the rent due under the terms of the lease. Interstate argues in the alternative that even if the lease is deemed to be ambiguous, the trial court erred in finding that the original contracting parties had contemplated that the rent could increase if payments under the First America note increased because of a restructuring of the loan. Rose Care also contends that the lease is unambiguous; however, it argues that the lease clearly allows the rent to increase as payments under the First America note increase. Rose Care argues in the alternative that if the lease is ambiguous in this respect, the trial court's finding as to the intent of the original contracting parties is not erroneous. Rose Care maintains that the original parties to the lease understood that the First America note had a "balloon" provision and that the note would mature on July 2, 1991, over 10 years before the lease would expire. According to Rose Care, the evidence, including the testimony of J.A. Gilbreath, the only witness at the trial who had actually been present during the negotiation of the lease, supports the trial court's judgment.
After carefully studying the briefs and examining the record, we agree with Rose Care that the judgment is supported by competent evidence and, therefore, that it is *Page 839 
due to be affirmed. Whether the lease is ambiguous was a question of law for the trial court. Fouts v. Beall,518 So.2d 1236 (Ala. 1987). Although it made no specific ruling on the issue, the trial court could have determined that the lease, although clear on its face, nonetheless suffers from a latent ambiguity. A latent ambiguity occurs when the language of an instrument is clear and intelligible, but, when considered in light of certain extraneous facts, takes on another meaning. See Gafford v. Kirby, 512 So.2d 1356, 1363 (Ala. 1987). As Rose Care correctly points out, the lease clearly provides that one component of the rent should be derived from the monthly principal and interest payment due under the First America note and that payments under the lease should be adjusted if the payments change under the terms of that note. The intent of the lease becomes less clear, however, when it is viewed in conjunction with the First America note, which contemplated that adjustments would be made to the monthly payments in response to fluctuating interest rates and which by its terms was to become due and payable more than 10 years before the expiration of the lease. The First America note contained no renewal provision; therefore, the lease is unclear as to whether the monthly rent payments were intended to be adjusted only so as to coincide with higher payments on the note that could result from fluctuating interest rates or whether the monthly rent payments were also intended to coincide with higher monthly payments on the note that could result from an extension and modification of the note. If the language of a contract, such as the lease in this case, contains a latent ambiguity, extrinsic evidence, including evidence of the surrounding circumstances and the construction placed on the language by the contracting parties, may be considered in determining the meaning of the contract. Fouts v. Beall;Gafford v. Kirby, supra.
J.A. Gilbreath, Rose Care's vice-president and chief financial officer, testified that the lease was negotiated as part of the settlement of a lawsuit and that it was the subject of much discussion between the attorneys representing the parties in that action. Gilbreath further testified that the original parties to the lease were aware that the amount paid under the First America note represented a portion of the rent due under the lease and that both parties understood that the First America note contained a "balloon" provision, making the note subject to renegotiation before the expiration of the lease. Because these material facts appear to be undisputed, the ore tenus presumption of correctness has no application in this case, Abel v. Forrest Realty, Inc., 484 So.2d 1069
(Ala. 1986), and we must review the evidence de novo to see if it supports the judgment. Although from the evidence one might draw conflicting inferences as to how the rent was intended to be calculated under the lease, one could reasonably infer that the monthly rent payments under the lease were intended to be adjusted so as to equal the payments due under the First America note, even if the payments under the note increased as the result of an extension and modification of the note. Accordingly, we hold that the judgment is supported by the evidence; therefore, it is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, STEAGALL, KENNEDY and INGRAM, JJ., concur.