988 So.2d 961 (2007)
NEW GOURMET CONCEPTS, INC.
v.
SIEDO INVESTMENTS COMPANY, L.L.C., et al.
Eric, Inc.
v.
Siedo Investments Company, L.L.C., et al.
1060442 and 1060473.
Supreme Court of Alabama.
October 19, 2007.
Rehearing Applications Denied January 18, 2008.
Albert L. Jordan and Stephen P. Leara of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, for appellant New Gourmet Concepts, Inc.
*962 L. Vastine Stabler, Jr., Birmingham, for appellant Eric, Inc.
Eddie Leitman and Christopher R. Hood of Leitman, Siegal & Payne, P.C., Birmingham, for appellee Siedo Investments Company, L.L.C.
STUART, Justice.
In 2005, the Board of Trustees of the University of Alabama at Birmingham ("UAB") used the power of eminent domain to acquire a parcel of real estate bordering UAB's campus ("the subject property"), which was then owned by Siedo Investments Company, L.L.C. At the time the subject property was condemned, BSD Foods, Ltd. ("BSD"), was leasing the subject property from Siedo; it, in turn, had subleased portions of the subject property to New Gourmet Concepts, Inc. ("NGC"), and Eric, Inc. After the subject property was condemned, NGC and Eric sought part of the condemnation proceeds based on their leasehold interests in the condemned property. The trial court held that NGC and Eric were not entitled to any share of the condemnation proceeds, and NGC and Eric appealed. We reverse and remand.

I.
The subject property, located at 514-518 18th Street South, was acquired by the Siegal family in two transactions  in 1927 they purchased the building and underlying land, and at some time in the 1950s they purchased the adjoining parking lot. For a period of years, the Siegal family operated Alabama Auto Parts Company on the premises; however, on October 31, 1983, the Siegal family, operating as Siedo, leased the subject property to Wendy's of Tuscaloosa, Inc., for the operation of a fast-food restaurant.[1] Paragraph 18 of the lease between Siedo and Wendy's ("the condemnation clause") provided as follows:
"If there is a partial taking of the demised premises by eminent domain, as the result of which the ground floor area is reduced by not more than ten percent (10%), the term of this lease will continue and Landlord at Landlord's expense, will restore the remaining premises to a complete architectural unit with store front, signs and interior of equal appearance and utility as they had previous to the taking, but there will be a pro rata reduction in the rent payable each month and Tenant will have no right to any of the proceeds of such taking. If on the other hand, the taking exceeds ten percent (10%) of the ground floor area, Tenant may, at Tenant's option, terminate this lease by giving Landlord thirty (30) days' notice in writing; or in the event the improvements are condemned and ordered torn down or removed by a lawful authority, then the term of this lease shall cease as of the date possession shall be taken by such authority, and the rent will be apportioned as of the date of such taking. In the event that any portion of the parking area be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or as to reduce the parking area by an amount in excess of fifteen percent (15%), Tenant may, at Tenant's option, terminate this lease by giving Landlord thirty (30) days' notice in writing and be liable for rent only up to the time of such taking, provided, however, *963 that Tenant may not terminate the lease in the event Landlord shall make available other reasonably accessible parking area as a substitute for the parking area so taken."
As contemplated in the lease, Wendy's immediately thereafter assigned its rights under the lease to BSD. The relevant terms of the lease, including the condemnation clause, were not modified by that assignment. BSD operated two restaurants on the subject property from 1984 to 1987; however, the restaurants closed in 1987, and the subject property remained vacant for approximately 10 years. BSD continued to pay rent to Siedo during that period pursuant to the terms of the lease.
On August 6, 1997, BSD entered into a sublease with NGC for the storefront at 514 18th Street South. On March 11, 1998, BSD entered into a sublease with Eric for the storefront at 518 18th Street South. NGC and Eric subsequently opened and operated McAlister's Deli and Panda Buffet restaurants, respectively, and shared use of the parking lot adjacent to the property.
On January 21, 2005, UAB filed an eminent domain action in the Probate Court of Jefferson County seeking to condemn the subject property, along with the rest of the city block in which the subject property was located, in order to construct a new teaching hospital for UAB's medical school. UAB named as parties in the eminent domain action Siedo, BSD, NGC, and Eric. The probate court appointed commissioners to determine the value of the subject property, and, on June 24, 2005, the probate court confirmed the commissioners' report concluding that the subject property was worth $2,100,000 and ordered that "all rights, title, and interests" in the subject property were condemned and awarded to UAB with "such condemnation to be effective upon the payment of the damages and compensation so assessed and reported by said commissioners, or the deposit of the same in court." On July 19, 2005, UAB paid the award into the court and acquired fee simple title to the subject property. On July 22, 2005, UAB filed a notice of appeal with the Jefferson Circuit Court, challenging the probate court's valuation of the subject property. Siedo filed its cross-appeal three days later.
On September 28, 2005, while its underlying dispute with UAB was still pending, Siedo moved for a partial summary judgment on the claims of BSD, NGC, and Eric, all of which were claiming the right to share in whatever condemnation proceeds Siedo ultimately received because of their leasehold interests in the subject property. See Harco Drug, Inc. v. Notsla, Inc., 382 So.2d 1, 3 (Ala.1980) ("In all cases where property taken for public use is in multiple ownership, each of the owners of an interest in the property has a corresponding right to share in the award."). However, Siedo argued that BSD, NGC, and Eric were precluded from sharing in the condemnation award because, Siedo claimed, under the terms of the condemnation clause, the lease automatically terminated upon condemnation. Siedo urged the trial court to adopt the majority rule that such an "automatic termination" provision cut off the tenant's right to share in a condemnation award. See Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 375-76 (Colo.1990) ("Most jurisdictions that have considered the legal effect of a condemnation clause providing only for automatic termination of the lease upon condemnation have held that because the lessee's leasehold interest is destroyed at the time of condemnation, the lessee no longer has any interest in the condemned property for which he or she should be compensated, *964 and the lessee is foreclosed from sharing in the condemnation proceeds.").
The trial court on November 15, 2005, ultimately denied Siedo's motion, holding that an ambiguity in the lease between Siedo and BSD created a genuine issue of material fact; however, it also stated that it would schedule an expedited evidentiary hearing on this issue at a later time if the parties so requested. On January 24, 2006, Siedo moved the court to schedule such a hearing; the trial court took no action on the request.
UAB and Siedo thereafter agreed on the sum of $2,000,000 as just compensation for the taking of the subject property and, on September 12, 2006, the trial court entered a consent judgment reflecting that agreement. In that order, the trial court made the following statement regarding the potential interests of BSD, NGC, and Eric in that condemnation award:
"The interests of the respective defendants in the remaining funds on deposit with the court are to be determined in a subsequent evidentiary hearing to determine whether or not the lease between [Siedo] and [BSD] automatically terminated upon condemnation, and a further ascertainment proceeding in this action, if necessary."
On October 2, 2006, Siedo renewed its earlier motion requesting such a hearing, and the trial court then scheduled the matter for a November 7, 2006, hearing.
At the outset of the November 7, 2006, hearing, Siedo and BSD announced that they had reached a settlement pursuant to which Siedo would pay BSD $285,000. Siedo also agreed with BSD to pay one-half of any awards subsequently made to NGC and Eric, but in no event would Siedo pay more than an additional $100,000. Based on this settlement, NGC and Eric argued that Siedo lacked standing to participate further in the hearing because the only issue remaining  whether NGC and Eric were entitled to share in the funds received by BSD  did not involve Siedo. The trial court overruled the objection. NGC and Eric also objected to the testimony of Siedo's witness, an experienced Birmingham real-estate attorney, who testified as to what he believed was the plain meaning of the condemnation clause, on the ground that the testimony concerned a question of law, but the trial court also overruled that objection.
On November 8, 2006, the trial court entered its final judgment holding that NGC and Eric were not entitled to share in the condemnation proceeds. The trial court's order stated, in pertinent part:
"At the hearing on the pending motion the court was informed that Siedo and BSD have entered into a settlement agreement whereby a certain amount of money will be paid from the condemnation funds to BSD for whatever interest it has in the property. The only remaining issue is whether the subtenants, [Eric] and [NGC], are entitled to share in the funds.
"Alabama follows that common-law rule that when condemned property is subject to a leasehold interest, the tenant has a right to share in the condemnation award. Harco Drug, Inc. v. Notsla, Inc., [382] So.2d 1 (Ala.1980). However, the Alabama courts have also recognized the right of the parties to modify that general rule by agreement. City of Dothan v. Wilkes, 269 Ala. 444, 114 So.2d 237 (1959).
". . . .
"The court addressed the meaning of the language of the [original] lease at the hearing of November [7], 2006. The only witness to testify was J. Fred Powell, a respected real estate attorney in Birmingham who has been practicing *965 law for over forty years. The court recognized that he is highly qualified as an expert in this field. Mr. Powell testified that he had examined the original lease and expressed his conclusion that the language of the original lease means that if there is a total taking of the property during the term of the lease, the lease terminates.
"[Quoting the condemnation clause]
"The operative language in the lease is `in the event the improvements are condemned and ordered torn down or removed by a lawful authority, then the terms of this lease shall cease as of the date possession shall be taken by such authority.'
"Here it is undisputed that the improvements, along with the real property, were condemned by the probate court. After the condemnation, the improvements on the property were `torn down or removed by a lawful authority.' UAB was the lawful authority. Therefore, the leaseholders' interest in the property ceased with the condemnation. Since the lease terminated under its own terms, the tenant and subtenants no longer have a legal interest in the property."
NGC and Eric subsequently appealed separately to this Court pursuant to § 18-1A-288, Ala.Code 1975. The two appeals have been consolidated for the purpose of writing one opinion.

II.
In its November 15, 2005, order denying Siedo's request for a partial summary judgment, the trial court stated that the language of the condemnation clause in the original lease was ambiguous. The November 7, 2006, hearing was presumably held to resolve that ambiguity; however, in the judgment entered after that hearing the trial court apparently concluded that the language of the condemnation clause in the original lease was not ambiguous, stating: "Alabama law is clear that `if the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court.'" (Quoting McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853, 855 (Ala.1991).)[2] In Hardin v. Kirkland Enterprises, Inc., 939 So.2d 40, 44 (Ala.Civ.App.2006), the Court of Civil Appeals succinctly stated the standard of review applicable to a case like this one:
"`It is well settled that lease agreements are contracts and that the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement.' Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc., 873 So.2d 1091, 1098 (Ala.2003). Whether a lease is ambiguous is a question of law for the trial court. Interstate Inv. Corp. v. Rose Care, Inc., 631 So.2d 836, 839 (Ala.1993). An appellate court applies a de novo review to a trial court's determination of whether a contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term. See Winkleblack v. Murphy, 811 So.2d 521, 525-26 (Ala.2001)."
Thus, we review de novo the judgment of the trial court.

III.
The issue before this Court is whether the condemnation clause operated to automatically terminate the lease agreement between Siedo and BSD in the event of a *966 total taking of the subject property by an action brought pursuant to the Alabama Eminent Domain Code, § 18-1A-1 et seq., Ala.Code 1975. If we conclude that the lease did automatically terminate when UAB took possession of the subject property, we must then consider whether to adopt in Alabama the rule advocated by Siedo  that an automatic-termination provision cuts off the right of a tenant to share in a condemnation award  or the rule advocated by NGC and Eric  that an automatic-termination provision does not cut off the right of a tenant to share in a condemnation award unless the provision is accompanied by language expressly stating that the tenant will not share in any such award.
We first consider whether the condemnation clause is ambiguous with respect to the effect of a total taking of the subject property on the lease. Before reversing course in its order entering a final judgment and concluding that the condemnation clause was not ambiguous, the trial court expressly recognized that the condemnation clause was ambiguous. For the reasons that follow, we agree with the trial court's first determination.
The condemnation clause, quoted in toto above, contains four subparts that specifically detail the effects of four different types of condemnations on the lease. The first subpart anticipates "a partial taking of the demised premises by eminent domain, as the result of which the ground floor area is reduced by not more than ten percent (10%)." In this scenario, the landlord has certain obligations to restore the premises; however, the lease continues, and the tenant has "no right to any of the proceeds of such taking." It is undisputed that this subpart is not relevant to the current dispute because there was a total taking, i.e., a taking of 100% of the premises, not a partial taking of less than 10% of the ground floor area.
The second subpart of the condemnation clause gives the tenant the right to terminate the lease (by giving 30 days' written notice) if "the taking exceeds ten percent (10%) of the ground floor area." Notably, this subpart uses the term "the taking" as opposed to "a partial taking." Thus, this subpart could potentially govern any taking exceeding 10% of the ground floor area, up to and including a total taking of the entire premises. Alternatively, the term "the taking" may refer to the taking described in the preceding subpart  "a partial taking of the demised premises by eminent domain"  in which case this subpart would be inapplicable to a total taking.
The third subpart of the condemnation clause states that "in the event the improvements are condemned and ordered torn down or removed by a lawful authority, then the term of this lease shall cease as of the date possession shall be taken by such authority...." The trial court reasoned that this subpart governed in the event of a total taking because the entirety of the subject property, including the improvements, were condemned, and those improvements were subsequently ordered torn down and removed by UAB, which was a lawful authority inasmuch as it had been given legal title to the property. NGC and Eric argue that the trial court's interpretation of this subpart is incorrect. They argue that the use of the term "improvements" instead of "premises" or "land" indicates that this subpart was intended to be implicated only in the event there was a court order requiring the "improvements," that is, the building, to be torn down or removed, as might occur if the building had become unsafe or a public nuisance, or if a rail or utility easement necessitated the removal of the structure. *967 Thus, depending on the interpretation applied, the third subpart might apply to a total taking of the premises.
The fourth and final subpart of the condemnation clause concerns the parking area and provides as follows:
"In the event that any portion of the parking area be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or as to reduce the parking area by an amount in excess of fifteen percent (15%), Tenant may, at Tenant's option, terminate this lease by giving Landlord thirty (30) days' notice in writing and be liable for rent only up to the time of such taking, provided, however, that Tenant may not terminate the lease in the event Landlord shall make available other reasonably accessible parking area as a substitute for the parking area so taken."
A total taking of the subject property encompasses the taking of more than 15% of the parking area; therefore, this subpart could also be deemed relevant to the total taking in the present case.
Thus, although none of the four subparts explicitly states that it governs in the event of a total taking, plausible arguments can be made that any of three subparts could govern in such a scenario. Two of those subparts would give the tenant, i.e., BSD, the right to terminate the lease after UAB took the subject property, and one subpart would operate to terminate the lease immediately upon UAB's taking of the property.[3] "When any aspect of a contract is capable of more than one meaning, it is ambiguous." Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala.1997). We therefore conclude that the condemnation clause is ambiguous insofar as it relates to the effect a total taking of the subject property would have on the original lease.
"When we find an agreement to be ambiguous, we must employ established rules of contract construction to resolve the ambiguity found in the inartfully drafted document." Whitson, 703 So.2d at 948. In the present case, the conclusion that the condemnation clause is ambiguous requires us to apply the rule that leases are to be construed more strongly against the lessor and more liberally in favor of the lessee. See Greenwood v. Bennett, 208 Ala. 680, 684, 95 So. 159, 163 (1923) ("It is true that it is only in the case of ambiguity and uncertainty that the rule is given application, that a lease must be construed most strongly against the lessor and liberally in favor of the lessee...."). Construing the lease in favor of BSD, the lessee, we hold that the lease did not automatically terminate when UAB took possession of the subject property. Therefore, the right of BSD, and by extension of NGC and Eric, to share in the condemnation proceeds was not extinguished. The trial court's judgment to the contrary is therefore due to be reversed.[4]

*968 IV.
The trial court entered a judgment holding that the lease between Siedo and BSD terminated after the subject property was taken and that BSD and its subleasees, NGC and Eric, accordingly had no right to share in the condemnation award. For the reasons discussed above, we hereby reverse that judgment and remand the cause for a further proceeding to determine the extent of NGC's and Eric's right to share in the condemnation award.
REVERSED AND REMANDED.
LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
SEE and MURDOCK, JJ., dissent.
COBB, C.J., recuses herself.
MURDOCK, Justice (dissenting).
Even if the main opinion is correct in its conclusion that paragraph 18 of the lease between Siedo Investments Company, L.L.C., and Wendy's of Tuscaloosa, Inc. (which I presume from the arguments of the parties was incorporated by reference into the subleases at issue), is ambiguous, I believe the main opinion jumps too quickly to reliance on the rule of contra proferentem. See FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc., 914 So.2d 344, 357-58 (Ala.2005) ("`[t]he rule of contra proferentem is generally a rule of last resort that should be applied only when other rules of construction have been exhausted. 3 Arthur L. Corbin, Contracts § 559 at 268-69 (1962)'" (quoting Lackey v. Central Bank of the South, 710 So.2d 419, 422 (Ala.1998))); 11 Richard A. Lord, Williston on Contracts § 32:12 at 480 (4th ed.1999).
More fundamentally, I dissent from the main opinion's reversal of the trial court's judgment because, like the trial court, I conclude that paragraph 18 of the lease is susceptible to only one reasonable interpretation and therefore is not ambiguous.
Paragraph 18, referenced in the main opinion as "the condemnation clause" of the lease, consists of several provisions that address the continued viability of the lease in various circumstances involving a partial or total taking of various portions of the demised premises. It provides that, in the event of a condemnation of a portion of, but less than all, the improvements, the lease does not automatically terminate, but that, in the event of a condemnation of the improvements in their entirety, the lease does automatically terminate. In a separate sentence, the tenant is given the option to terminate the lease in the event of a condemnation of a substantial portion of the parking area adjacent to the improvements. In this case, in addition to a condemnation of the adjacent parking lot, there was, in fact, a total condemnation of the improvements. Under the plain language of paragraph 18, therefore, the lease automatically terminated.
To read paragraph 18 as not resulting in the automatic termination of the lease in the circumstances presented in this case is to force a reading which not only is contrary to the plain language of that paragraph, but which will lead to an unreasonable  indeed illogical  result. It will mean that an automatic termination of the lease is mandated in the event of a complete condemnation of the improvements, but not in the event of a complete condemnation of the improvements plus a substantial portion of the adjacent parking area. The only reasonable construction of paragraph 18 is that the sentence providing merely for an option to terminate the lease in the event of a taking of a substantial portion of the parking lot was meant to apply only when there has not been an accompanying complete taking of the improvements *969 and a resulting automatic termination of the lease.
When only one reasonable interpretation emerges from the reading of a contract, it is not ambiguous within the contemplation of the law. McCollough v. Regions Bank, 955 So.2d 405, 411 (Ala.2006). I therefore respectfully dissent.
SEE, J., concurs.
NOTES
[1] At the time this action was filed, the members of Siedo were Irvin Siegal, Ellen Siegal Dorsky, and Jack Dorsky.
[2] The trial court continued, stating that "[w]hether the lease provision before the court is ambiguous and subject to interpretation by the court or not, the result is the same."
[3] It is undisputed that BSD never took any action to terminate the lease.
[4] Our holding that the automatic-termination provision in the condemnation clause was not applicable in the event of a total taking of the subject property obviates the need to consider whether such a provision operates to automatically cut off the right of a tenant to share in a condemnation award. It is also unnecessary to consider NGC and Eric's argument that the trial court improperly allowed Siedo to present expert testimony in the form of a real-estate attorney, whose testimony, NGC and Eric claim, amounted to nothing more than impermissible legal conclusions.