WOODALL, Justice.
 

 N & L Enterprises, LLC (“N & L”), entered into a lease with Lioce Properties, LLP, in January 2006 for office and warehouse space in a building owned by Lioce Properties. Lioce Properties later sued N & L, alleging that N & L had defaulted on its obligations under the lease. The trial court entered a summary judgment in favor of Lioce Properties, finding that N & L had breached the lease and awarding Lioce Properties $939,845.14. N & L appealed. We affirm in part, reverse in part, and remand.
 

 Facts and Procedural History
 

 N & L, whose primary business involves copier sales and service, was originally owned by Nicholas Lioce, Jr.; his wife, Louise Lioce; and their sons, Nick Lioce (“Nick”) and Harry Lioce (“Harry”). In 2000, the Lioces sold N & L to Berney, Inc., a division of Global Imaging, Inc. Berney, Inc., retained Nick as the president of N & L.
 

 According to N & L, while Nick was managing N & L, he suggested to Harry, who was the chief operating officer of Interconnect Systems Corporation (“Interconnect”), that N & L and Interconnect work together to obtain a copier-service contract with the United States Army at Redstone Arsenal (“the AMCOM contract”). N & L could not pursue the AM-COM contract on its own, because the contract was set aside for small businesses, i.e., a small-business set-aside contract, and N & L was too large to qualify for the contract. On the other hand, Interconnect qualified as a small business for
 
 *275
 
 purposes of the AMCOM contract but, according to N & L, Interconnect did not, at that time, have the ability to provide copier service. In January 2004, N & L and Interconnect entered into a partnering agreement, and Interconnect was successful in obtaining the AMCOM contract. N & L and Interconnect jointly worked on the AMCOM contract until August 2006. Interconnect paid N & L approximately 90% of the revenue it collected under the AMCOM contract.
 

 In January 2006, N
 
 &
 
 L entered into a commercial lease agreement (“the lease agreement”) with Lioce Properties pursuant to which N & L leased from Lioce Properties 20,565 square feet of office and warehouse space in a building located at 2950 Drake Avenue in Huntsville (“the building”). At that time, Interconnect was already a tenant in the building.
 

 The events underlying this dispute began on August 4, 2006, when N & L terminated Nick’s employment as its president. On August 25, 2006, Interconnect terminated its partnering agreement with N & L and took over the copier-service work under the AMCOM contract. On August 30, 2006, N & L informed Lioce Properties that
 

 “under the terms of the lease covering the space leased by N & L from [Nick’s] family, N
 
 &
 
 L may terminate the lease if any competitive business is operated out of the building in which N & L is located. It now appears [Nick] and/or his family were in fact operating a competitive business in the building. Accordingly, we are evaluating all our options, including, without limitation, the termination of the lease.”
 

 On May 2, 2007, Lioce Properties informed N & L that it considered N
 
 &
 
 L’s failure to pay some of the rent owed for January 2007 a default under the terms of the lease, and it demanded payment of $2,746.77 plus a late charge and an attorney fee. On May 31, 2007, N
 
 &
 
 L informed Lioce Properties that it was terminating the lease pursuant to § 3.8
 
 [1]
 
 of the lease and that N & L would vacate the property immediately. Lioce Properties admits that N & L vacated the premises on or about May 31, 2007, but says that it could not access the building for a short while thereafter because N & L retained some building-security-system codes and keys.
 

 On June 29, 2007,' N & L again told Lioce Properties that it was terminating the lease pursuant to § 3.8 because, it said, Interconnect, a tenant in the building, was engaging in activities that directly competed with N
 
 &
 
 L’s business. On July 5, 2007, Lioce Properties informed N & L that, based on N & L’s alleged default for failure to pay rent, Lioce Properties had elected to accelerate “rents and other sums due.”
 

 Meanwhile, on July 1, 2007, Lioce Properties rented space in the building to The Lioce Group, Inc., formed by Nicholas Lioce, Jr., and Louise Lioce in April 2007 to provide copier sales and service. According to Lioce Properties,
 

 “[t]he Lioce Group rented 1,400 square feet of warehouse space and 308 square feet of office space of the 20,565 square
 
 *276
 
 feet formerly rented by N & L (a total of 1,708 square feet, or 8.3% of N & L’s former Building space). In December 2007, The Lioce Group rented another $180.00/month in additional Building space.”
 

 Lioce Properties’ brief, at 10-11. According to Lioce Properties, the remainder of the space formerly occupied by N & L remains unleased despite what it describes as “considerable, ongoing efforts by Lioce [Properties]” to lease the space.
 
 Id.
 
 at 11.
 

 On June 18, 2007, Lioce Properties sued N & L, alleging “that N & L was in default of the Lease [agreement] and seeking damages in the nature of past due rent, accelerated future rent, additional rent for operating expenses, late fees, interest, and legal fees pursuant to the Lease terms.” N & L’s brief, at 3. N
 
 &
 
 L filed a counterclaim seeking a judgment, declaring that N & L was legally entitled to terminate the lease under § 3.8.
 

 Lioce Properties filed a motion for a partial summary judgment on the issue of N & L’s alleged breach of the lease agreement and later moved for a summary judgment on the issue of damages. N & L moved for a summary judgment on its counterclaim.
 

 On December 16, 2008, the trial court granted Lioce Properties’ motion for a summary judgment regarding N & L’s claim alleging breach of the lease agreement and denied N & L’s motion for a summary judgment on its counterclaim. The trial court found:
 

 “Interconnect cannot be deemed a competitor. While Interconnect terminated a business relationship with [N & L] and assumed [N & L’s] duties with regard to a government contract, [N
 
 &
 
 L] was legally precluded from competing for that contract since it did not qualify for small business set-aside work. Further, [N & L] was generally in the business of selling and servicing copiers, scanners, printers and fax machines. No evidence suggests that Interconnect was engaged in this line of business, with its work limited to the government contract in question along with sales and service of certain telecommunication equipment.”
 

 Subsequently, the trial court entered a summary judgment in favor of Lioce Properties on the issue of damages, resulting in a final judgment against N & L in the amount of $939,845.14. N & L appeals from that judgment.
 

 Issues
 

 N & L identifies three issues this Court must address: (1) “[w]hether the trial court erred by finding that ... there was no competition between Interconnect and N & L that would justify N & L terminating the lease”; (2) “[w]hether the trial court erred by not finding a legal abandonment of the lease by N
 
 &
 
 L, and a termination of the lease by Lioce [Properties]”; and (3) “[w]hether the trial court erred by finding that the terms of the lease super-ceded Alabama law on the remedies available to a lessor in the event of an abandonment.” N
 
 &
 
 L’s brief, at 6.
 

 Standard of Review
 

 “This Court’s review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. In making such a determination, we must review the evidence in the light most favorable to the non-movant. Once the movant makes a pri-ma facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce
 
 *277
 
 ‘substantial evidence’ as to the existence of a genuine issue of material fact. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
 

 Dow v. Alabama Democratic Party,
 
 897 So.2d 1035, 1038-39 (Ala.2004) (quoting
 
 West v. Founders Life Assur. Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)) (citations omitted).
 

 Analysis
 

 I.
 

 N & L first argues that the trial court erred in finding as a matter of law that Interconnect was not competing with N
 
 &
 
 L’s business and that, therefore, N
 
 & L
 
 did not have the legal right to terminate the lease agreement pursuant to § 3.8. Section 3.8 provides:
 

 “Landlord shall not lease to or otherwise permit any other office equipment dealer or similar business to occupy any space in the Building. Any violation of this Section 3.8 shall constitute a breach of this Lease [agreement] and, in addition to any other remedy to which Tenant may be entitled, Tenant may immediately terminate this Lease [agreement]. This clause does not apply to current tenants of the Building so long as any current tenants of the Building do not directly compete with Tenant’s business.”
 

 N
 
 &
 
 L argues that Interconnect was clearly in competition with it for purposes of § 3.8 because, after the termination of the partnering agreement between N & L and Interconnect, Interconnect took over N & L’s business as the copier-service provider under the AMCOM contract. According to N & L, “[w]hen Interconnect became the new provider of copier service to AMCOM it unquestionably went into competition with N
 
 &
 
 L.” N & L’s brief, at 19.
 

 The only authority N & L cites in support of its arguments are definitions of the word “competition” it has taken from Lioce Properties’ motion for a partial summary judgment:
 

 “ ‘[Competition is] [t]he struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties.
 
 Black’s Law Dictionary,
 
 West Publishing. Competition is the struggle between rivals for the same trade at the same time.
 
 Ferd Heim Brewing Co. v. Belinder,
 
 71 S.W. 691, 695 (Mo.Ct.App.1902). Rivalry between two or more businesses striving for the same customers or market.
 
 Webster’s II New College Dictionary
 
 (1995). Direct competition means that the two [competitors] served essentially the same group of customers with essentially the same goods and services.
 
 Bagdon v. Firestone Tire & Rubber Co.,
 
 [No. 87 C 4698, November 16, 1989] (N.D.Ill.1989) [ (not reported in F.Supp.) ]. Any person who competes with another person in the same market area at the same level of distribution.
 
 McGuire Oil Co. v. Mapco, Inc.,
 
 612 So.2d 417, 420 (Ala.1992).’ ”
 

 N & L’s brief, at 18-19. N & L then argues that “[a]ll of these definitions apply to the relationship between Interconnect and N
 
 &
 
 L after Interconnect terminated the partnering agreement.”
 
 Id.
 
 at 19. We disagree.
 

 According to N & L, before the partnering agreement, “Interconnect’s business had focused on providing telecommunication equipment and services,” and “Interconnect [had done] no copier service work.” N & L’s brief, at 2, 8. On the other hand, N & L’s primary business had always been copier sales and service.
 
 *278
 
 There is no evidence, outside the context of the AMCOM contract, indicating that N & L and Interconnect ever provided any of the same services or served any of the same customers. There is no evidence indicating that N & L and Interconnect ever competed with each other for the same contracts or business opportunities. Therefore, we cannot say that N & L and Interconnect were pursuing “the same trade at the same time,” “striving for the same customers or market,” or “serv[ing] essentially the same group of customers with essentially the same goods and services.”
 

 Moreover, in the context of the AMCOM contract, N & L was not “competing] ... in the same market area at the same level of distribution” as, or competing with, Interconnect “to obtain the same business from third parties” because the AMCOM contract is a small-business set-aside, and N & L is too large to pursue the contract on its own. Therefore, the trial court correctly concluded that “Interconnect cannot be deemed a competitor” in terms of the lease agreement and that N & L “was ... not entitled to rely on [§] 3.8 ... to terminate the lease.” We affirm the trial court’s judgment in this regard.
 

 II.
 

 N
 
 &
 
 L next argues that “[t]he trial court erred by not finding a legal abandonment of the lease by N & L, and a termination of the lease by Lioce [Properties], when there was no evidence to the contrary.” N & L’s brief, at 22. Abandonment is “[t]he relinquishing of a right or interest with the intention of never again claiming it.”
 
 Black’s Law Dictionary
 
 2 (8th ed. 2004). In a plurality opinion, Justice Brown wrote: “The distinction between default and abandonment has previously been recognized in Alabama law.... As a general rule, abandonment occurs when the lessee leaves the premises vacant with the avowed intention not to pay rent.”
 
 Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc.,
 
 873 So.2d 1091, 1100 (Ala.2003) (citations omitted).
 

 “[W]hen a tenant abandons leased premises the landlord has two options. First, the landlord may allow the premises to remain vacant and recover rent for the whole term of the lease, or the landlord may end the lease by accepting the abandoned property and re-entering the premises.”
 

 Ex parte Kaschak,
 
 681 So.2d 197, 200 (Ala.1996).
 

 N & L argues that it abandoned the leased premises by vacating the building on May 31, 2007, and informing Lioce Properties that it considered the lease to have been terminated pursuant to § 3.8. Further, N & L argues that Lioce Properties accepted the abandonment by retaking possession of the property and by leasing a portion of the premises to The Lioce Group. Therefore, N & L argues, the lease was terminated, and Lioce Properties’ “damages are thus limited to any unpaid rent up to the date of the termination of the lease.” N & L’s brief, at 25.
 

 Lioce Properties acknowledges that N & L vacated the premises on May 31, 2007, and that N & L informed Lioce Properties that it considered the lease to have been terminated. Nick testified that Lioce Properties “regain[ed] access and control over the premises that had been vacated” and that “Lioce Properties has had control of those premises ever since.” Lioce Properties also acknowledges that “Me-ginning on July 1, 2007, ... The Lioce Group rented ... warehouse space and ... office space ... formerly rented by N & L.” Lioce Properties’ brief, at 11. Lioce Properties also admits that it has made “considerable, ongoing efforts” to
 
 *279
 
 lease the remainder of the space vacated by N & L.
 
 Id.
 

 This undisputed evidence indicates that, by July 1, 2007, Lioce Properties had retaken possession and control of the leased premises. Therefore, we agree with N & L that “[i]t is clear from the evidence that there has been a legal abandonment, an acceptance of the abandonment, and a surrender of the lease,” N & L’s brief, at 24, and that Lioce Properties “end[ed] the lease by accepting the abandoned property and reentering the premises.”
 
 Kaschak,
 
 681 So.2d at 200. Had the trial court properly applied the well recognized principles of abandonment and termination of leases, it could not have awarded damages representing rent due after the lease had been terminated. However, as discussed in Part III of this analysis section, the trial court found that these principles did not apply under the facts of this case.
 

 III.
 

 N & L next argues that “[t]he trial court erred by finding that the terms of the lease superceded Alabama law on the remedies available to a lessor in the event of an abandonment.” N & L’s brief, at 26. Specifically, the trial court held that “the language of Section 8.2 of the lease [agreement] ... trumps the common law.” Lioce Properties argues that § 8.2(a) of the lease agreement “mandates that N & L’s lease obligations continue
 
 even if
 
 N & L
 
 surrendered
 
 or Lioce [Properties] reentered and repossessed the leased premises.” Lioce Properties’ brief, at 22 (emphasis in original).
 

 N & L argues, however, that § 8.2 “does not address a situation where there has already been an abandonment by the tenant,” N & L’s brief, at 27, and that because “abandonment does not come within the purview of the lease [agreement], the lease [agreement] cannot be used to supercede the remedies available at common law.”
 
 Id.
 
 at 28. We agree with N & L.
 

 “ ‘ “[L]ease agreements are contracts and ... the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement.” ’ ”
 
 New Gourmet Concepts, Inc. v. Siedo Invs. Co.,
 
 988 So.2d 961, 965 (Ala.2007) (quoting
 
 Hardin v. Kirkland Enters., Inc.,
 
 939 So.2d 40, 44 (Ala.Civ.App.2006), quoting in turn
 
 Bowdoin Square,
 
 873 So.2d at 1098). “In construing a contract, this Court is guided by the principle that ‘ “[t]he intention of the parties controls ... and the intention of the parties is derived from the contract itself, where the language is plain and unambiguous.” ’ ”
 
 State ex rel. Riley v. Lorillard Tobacco Co.,
 
 1 So.3d 1, 12 (Ala.2008) (quoting
 
 Dunes of GP, L.L.C. v. Bradford,
 
 966 So.2d 924, 928 (Ala.2007), quoting in turn
 
 Loerch v. National Bank of Commerce of Birmingham,
 
 624 So.2d 552, 553 (Ala.1993)). This Court has also stated: “[I]t is well settled that the words of a contract are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract itself.”
 
 Food Serv. Distribs., Inc. v. Barber,
 
 429 So.2d 1025, 1028 (Ala.1983).
 

 The terms “abandon” or “abandonment” do not appear in the lease agreement. Nevertheless, Lioce Properties argues that § 8.2 of the lease agreement applies, because § 8.2 addresses circumstances in which the tenant surrenders the premises and the landlord reenters and/or repossesses the premises.
 

 “ ‘ “It is well settled that a court in seeking to ascertain the intention of the parties in construing a contract, will consider the contract as a whole, although the immediate object of the inquiry is the meaning of a particular clause. Further, a contract must be construed as a
 
 *280
 
 whole and, whenever possible, effect must be given to all its parts.” ’ ”
 

 Gulf Coast Realty Co. v. Professional Real Estate Partners, Inc.,
 
 926 So.2d 992, 1005 (Ala.2005) (quoting
 
 West Town Plaza Assocs., Ltd. v. Wal-Mart Stores, Inc.,
 
 619 So.2d 1290, 1294 (Ala.1993), quoting in turn
 
 Land Title Co. of Alabama v. State ex rel. Porter,
 
 292 Ala. 691, 698, 299 So.2d 289, 295 (1974)).
 

 ' Section 8 of the lease agreement addresses “Default and Remedies,” and its subsections set forth (1) the circumstances that constitute a default by N
 
 &
 
 L, which do not include abandonment (§ 8.1); (2) the remedies available to Lioce Properties if N
 
 &
 
 L defaults (§ 8.2); (3) the assessment of costs incurred by Lioce Properties as the result of a default by N & L (§ 8.3); (4) the protection of Lioce Properties against a waiver of a default (§ 8.4); and (5) the circumstances that constitute a default by Lioce Properties (§ 8.5).
 

 Section 8.2(a), upon which Lioce Properties relies, provides:
 

 “In the event of any
 
 default
 
 hereunder by Tenant, then without prejudice to any other rights which it has pursuant to this Lease or at law or in equity, the Landlord shall have the following rights and remedies, which are cumulative and not alternative:
 

 “(a)
 
 Landlord may terminate this Lease [agreement] by notice to Tenant and retake possession
 
 of the Premises for Landlord’s account.
 
 Tenant shall then quit and surrender the Premises to Landlord.
 
 Tenant’s liability under all of the provisions of this Lease [agreement] shall continue
 
 notwithstanding any expiration and surrender, or any re-entry, repossession, or disposition hereunder,
 
 including to the extent legally permissible, payment of all Rent and other charges until the date this Lease [agreement] would have expired had such termination not occurred. If Landlord so elects, Rent shall be accelerated and Tenant shall pay Landlord damages in the amount of any and all sums which would have been due for the remainder of the Term.”
 

 (Emphasis added.)
 

 Read in context, § 8.2(a) preserves N & L’s liability under the lease agreement, “notwithstanding any expiration and surrender, or any re-entry, repossession, or disposition” that occurs
 
 after
 
 the
 
 landlord
 
 has terminated the lease agreement “by notice to Tenant.” In this case, it was N & L, the
 
 tenant,
 
 that gave notice to Lioce Properties, the landlord, that N & L was terminating the lease agreement pursuant to § 3.8. The lease agreement simply does not address, as Lioce Properties claims, whether N & L’s liability under the lease agreement remains intact in the event it abandons the leased premises, regardless of a reentry by Lioce Properties. Therefore, the trial court erred in determining that the provisions of the lease agreement “trump” the common law as to the effect of an abandonment by the tenant followed by the acceptance of the abandonment by the landlord who reentered and re-let the property.
 

 Conclusion
 

 N
 
 &
 
 L was not entitled to terminate the lease agreement pursuant to § 3.8. However, because the lease was terminated by Lioce Properties’ actions following N & L’s abandonment of the leased premises, N & L’s liability is limited to the amounts owed under the lease agreement through the date of termination. Thus, the trial court erred in awarding Lioce Properties damages in excess of those amounts. Therefore, we reverse the trial court’s summary judgment as to damages and remand the case for further proceedings consistent with this opinion.
 

 
 *281
 
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 COBB, C.J., and SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . Section 3.8 of the lease provides:
 

 "Landlord shall not lease to or otherwise permit any other office equipment dealer or similar business to occupy any space in the Building. Any violation of this Section 3.8 shall constitute a breach of this Lease [agreement] and, in addition to any other remedy to which Tenant may be entitled, Tenant may immediately terminate this Lease [agreement]. This clause does not apply to current tenants of the Building so long as any current tenants of the Building do not directly compete with Tenant’s business.”